**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00183 (TSC)** |
| **v.** | : | |
| | : | |
| **BRIAN KORTE,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Brian Korte to 30 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Brian Korte, age 67, a plumber from York Haven, Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Korte pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days of incarceration is appropriate in this case because Korte (1) was near the front of a mob that removed police barriers and assaulted police officers at three locations on the East Front of the Capitol; (2) did not make contact with the police himself, but was close enough to observe the violence and then joined the mob in advancing forward into the

1

restricted areas of the Capitol after the police lines were broken; (3)  apparently took numerous videos or photos of the riot in and outside the Capitol, which he subsequently deleted from his phone and did not provide to law enforcement officials; and (4) has not expressed remorse for what he did.

The Court must also consider that Korte's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and to disrupt the proceedings.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of Offense at 1-7.

### *Defendant Korte's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Korte traveled to Washington, D.C. to participate in the "Stop the Steal" rally.  At the rally, Korte met members of a Pennsylvania organization called "Free PA." On its public website, https://www.freepa.net/, Free PA lists its mission as, among other things, organizing physical meetings for like-minded patriots to gather, communicate and strategize, and to "secure our elections." Two other associates of Free PA, Michael Pomeroy and Lynwood Nester, are Korte's co-defendants in this case.

At approximately 1:59 p.m., Korte was part of a crowd on the East Plaza of the U.S. Capitol. Members of the crowd were holding flags and signs. Korte was wearing a camouflage hat

with "TRUMP" in white letters, a blue hoodie, and a camouflage backpack. Korte was carrying a flag on a pole.[1]



*Figure 1: Korte (circled in yellow) with co-defendants Pomeroy and Nester and other convicted members of Free PA before he entered the restricted area of the Capitol.*

U.S. Capitol Police officers used metal bike racks to prevent the mob from entering the restricted area and unlawfully accessing the Capitol.  Korte stood watching as members of the crowd assaulted the police and removed the metal security barriers.  Korte was close enough to see members of the mob fighting with the police.

---

[1] The flag, which Korte displayed after he breeched the first police line, depicted a skull surrounded by guns with the words "Live Free or Die."



*Figure 2: Korte (circled in yellow) watching as the mob attacks the police line on the East Front Plaza.*



*Figure 3: Korte (circled in yellow) watches other rioters remove a metal bike rack from the police line. Moments later Korte surged forward with the mob.*

Immediately after the police line was overrun, Korte surged forward with the mob into the restricted area on the East Plaza.



*Figure 4: Korte advancing into the restricted area seconds after other rioters removed bike rack barriers.*

After rioters overran the first Capitol Police line on the East Plaza, police officers fell back to a location on the stairs that lead to the Rotunda Door.  They formed a line halfway up the stairs to prevent the mob from accessing the door. Korte stood with the mob, watching and recording with his phone, as other rioters pushed past the police.



*Figure 5: Korte (in yellow rectangle) can be seen in the mob at the foot of the stairs on the East Plaza, recording with his phone, as other rioters struggle with the police who attempt to prevent them from going up the stairs.*

At the top of the stairs, several U.S. Capitol Police officers held their ground outside the Rotunda Door. The mob sprayed these officers with tear gas, hit them with objects, and threw projectiles at them. While Korte does not appear to have had physical contact with these officers, he was close enough – constantly filming with his phone – to see other rioters assault these officers.



*Figure 6: Korte filming as rioters assault officers who are attempting to guard the Rotunda Door.*

Other rioters succeeded in violently overrunning the remaining officers at the door. At approximately 2:40 p.m., Korte entered the U.S. Capitol building with the mob.

Korte entered just behind a group of Oath Keepers militia members dressed in camouflage gear, helmets, and goggles. Korte entered on the second floor on the east side of the building and proceeded to walk to several locations inside.



*Figure 7: Korte (circled in yellow) entering the Capitol building through the Rotunda Door. Members of the Oath Keepers militia wearing camouflage helmets, body armor, and goggles (circled in red) can be seen in front of him.*

Inside the Capitol, Korte briefly went into the Rotunda. He entered a stairway to the third floor. Korte returned to the foyer area near the Rotunda Door. Korte stayed in the foyer area for several minutes, taking pictures and looking at his phone, while other rioters exited the building.



*Figure 8: Korte using his phone to take video in the foyer area.*



*Figure 9: Korte recording with his phone as other rioters exit.*



*Figure 10: Korte looking at his phone while other rioters exit.*



*Figure 11: Korte filming with his phone shortly before exiting the building.*

Korte exited the Capitol building at approximately 2:51 p.m. through the same door that he had entered. He remained on the veranda outside the East Front door – within the restricted area of the Capitol grounds – with a crowd of other rioters for approximately an hour before he left.

*Interview with Law Enforcement Officials*

On June 21, 2021, the FBI interviewed Korte at his residence in York Haven, Pennsylvania. Korte was provided with *Miranda* warnings and agreed to speak to the agents.  Korte admitted that he went into the Capitol on January 6. He claimed to have traveled to DC by himself and met other people from Pennsylvania in Washington D.C. He declined to identify the other individuals he met.  He admitted he saw other people breaking windows and busting down doors.

Korte initially denied he had taken any video, but after being shown a photograph of himself inside the Capitol, he admitted he might have taken video inside. When agents looked at Korte's phone pursuant to a search warrant, they saw photos from November and December 2020, but none from January 2021. According to Korte, he got a new phone after January 6 and only some of his photos were transferred from his old phone. Korte stated that he might have deleted photos on his old phone that related to the events of January 6 at the U.S. Capitol.

*The Charges and Plea Agreement*

On May 11, 2022, the United States charged Pomeroy, Korte, and Nestor by criminal complaint with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a  Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

On May 20, 2022, law enforcement officers arrested Korte in York Haven, Pennsylvania. On May 25, 2022, the United States charged Pomeroy, Korte, and Nestor by a four-count Information with violating the same four statutes.  On February 8, 2023, Pomeroy pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). On May 8, 2023, this Court sentenced him to 30 days incarceration. Nestor is awaiting trial, scheduled for October 16, 2023.

On March 24, 2023, pursuant to a plea agreement, Korte pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Korte agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Korte now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days imprisonment.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Korte's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Korte, the absence of violent or destructive acts is not a mitigating factor. Had Korte engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Korte's case is that he was standing within a few feet of violent members of the mob as they overran the police lines on the East Front of the Capitol. Several times, Korte moved to the "front line" where other rioters were confronting the police. While the Government is unaware of evidence that Korte himself made physical contact with police officers, he stood within a few feet of other rioters who wrestled the metal barricades away from the police, creating the gap through which the rest of the mob surged.

Rather than turn away after observing other members of the crowd fighting with the police, Korte joined these individuals in surging forward though the broken police line. When the police fell back and attempted to make a second line on the stairs, Korte joined the mob that surged up the steps and overwhelmed the second police line.

At the doors of the Capitol, Korte again pressed forward with other individuals who behaved violently toward the police. He stood within a few feet of the door that officers of the U.S. Capitol Police fought to keep closed.  When other rioters succeeded in opening this door, Korte pushed forward with the mob into the U.S. Capitol building. Korte encouraged members of the Oath Keepers militia to enter before him and then followed them inside.

Thus, while he may not have physically engaged with the police himself, Korte was an essential part of the mob that overwhelmed the police at multiple locations through its sheer numbers. He was close to the front, and without his presence added to the force of the mob that, on account of its size, was able to overwhelm the police lines.

Korte entered the Capitol building and stayed inside for approximately 11 minutes. The Government is unaware of evidence that Korte participated in the destruction of property or assaulted police inside the Capitol. However, Korte can be seen in many pictures and videos appearing to record video or still photographs with his phone. In nearly every image captured on CCTV video, Korte is using his phone to record photos or video of the riot. While other rioters exited the building through the Rotunda Door, Korte stayed inside the foyer and recorded videos of the police and rioters, making the job of the police officers who were lawfully attempting to clear the building that much more difficult.

In sum, the nature and the circumstances of this offense support the Government's recommendation of 30 days' imprisonment.

### B.  Korte's History and Characteristics

According to the Draft PSR, Korte has no prior convictions. The Draft PSR identified one prior arrest – for issuing a bad check for $575 in 2022 – that was subsequently dismissed.  PSR 34.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

14

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, Korte has not expressed remorse for his acts on January 6. The government is aware of no such statement of remorse when Korte was interviewed by FBI agents or during the time preceding the sentencing hearing.

In fact, rather than accept responsibility, Korte appears to have attempted to mislead the FBI agents about his actions inside the Capitol. While Korte clearly took photos and/or videos during the entire time he was inside the Capitol, he initially did not admit this to the agents. Only after being shown photographs of himself, did he admit to recording photos and/or video and subsequently deleting the materials from his phone.

Accordingly, the Court may reasonably conclude that specific deterrence is warranted to prevent Korte from committing similar acts again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Korte based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Korte has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court may consider other cases in which defendants pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). In the cases discussed below, the defendants were not alleged to have engaged in violence or destruction of property. Like Korte, they were charged with

only misdemeanors and pled guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building.

For example, in *U.S. v. Jeremy Sorvisto*, 21-CR-320-ABJ, the defendant entered the Capitol building and remained inside for 25 minutes. Afterwards, he instructed others to destroy a photo he had taken in the Capitol and generally expressed no remorse. Judge Berman Jackson sentenced him to 30 days' incarceration.

In *U.S. v. Oliver Sarko*, 21-CR-591-CKK, the defendant observed other rioters violently enter the Capitol building before entering himself. He made statements, including "we are storming the Capitol" and went to several locations within the Capitol, including the office of a congressperson. Judge Kollar-Kotelly sentenced him to 30 days' incarceration.

In *U.S. v. John Cameron*, 22-CR-017-TFH, the defendant entered the Capitol building past alarms and broken glass and remained inside for 20 minutes. He filmed a conflict between police and the crowd and posted afterwards that January 6 was a "fun, exciting" event. Judge Hogan sentenced him 30 days' incarceration.

Additionally, as noted above, Korte's co-defendant Pomeroy was previously sentenced by this Court to 30 days' incarceration. While there is no requirement that co-defendants receive identical sentences, Pomeroy's case is instructive because his offense conduct and prior record are very similar to that of Korte. Both defendants saw the police struggle to maintain lines on the East Front; each surged forward with the mob and illegally entered the building for a short period of time; both took videos or photos inside, which they subsequently deleted; neither was alleged to have acted violently or destroyed property; and neither had any prior criminal convictions. Accordingly, the Government would submit that an equal sentence of 30 days' incarceration is appropriate for Korte.

While the details in each case differ, the defendants' conduct in these cases is generally similar to that of Korte. In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[3]

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537,

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these

factors, the government recommends that this Court sentence Defendant to 30 days' incarceration,

36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence

protects the community, promotes respect for the law, and deters future crime by imposing

restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of

responsibility for his crime.

                                    Respectfully submitted,

                                    MATTHEW M. GRAVES
                                    United States Attorney
                                    D.C. Bar No. 481052

                    By:      s/ Brian Morgan
                                    BRIAN MORGAN
                                    NY Bar No. 4276804
                                    Trial Attorney
                                    601 D Street, N.W.
                                    Washington, D.C. 20530
                                    Brian.morgan@usdoj.gov
                                    (202) 305-3717

---

539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

    In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## <u>CERTIFICATE OF SERVICE</u>

On this 5th day of July a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Brian Morgan*
Trial Attorney
601 D Street, N.W.
Washington, D.C. 20530
Brian.morgan@usdoj.gov
(202) 305-3717